UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

| | | |
|---|---|---|
| BRENDA KAY BROWN, | ) | |
| | ) | |
| Appellant, | ) | Civil No. 12-110-ART |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES A. BROWN, et al., | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |
| | ) | |
| BRENDA KAY BROWN, | ) | Civil No. 12-120-ART |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| RICHARD M. WEHRLE, et al., | ) | |
| | ) | |
| Appellees. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Sometimes bankruptcy proceedings are more like soap opera episodes.  While her husband James was recovering from a stroke, Brenda Brown transferred millions of dollars from his estate to her name and went on a spending spree.  When James's attorney caught wind of her scheme, he froze the assets, filed suit against Brenda, and initiated divorce proceedings.[1]  Unable to access her accounts, and taking on debt from the purchases she had made, Brenda filed for bankruptcy.  She also brought an adversary proceeding in the Bankruptcy Court seeking to void the couple's antenuptial agreement ("Antenuptial") and

---

[1] The Court means no disrespect to either of the parties by use of their first names. The Court only used the first names because it was the easiest way to avoid confusion.

secure ownership of the disputed assets. Her plan backfired. The Chapter 11 proceeding soon became a Chapter 7 proceeding, and the Trustee quickly settled the adversary proceeding in James's favor ("Settlement"). The Settlement included an endorsement of the Antenuptial as valid and binding ("Antenuptial Endorsement"). On appeal, Brenda claims that the Bankruptcy Court did not have jurisdiction to approve the Antenuptial Endorsement and erred in approving the Settlement.

Brenda's challenges are meritless. The Antenuptial Endorsement was within the Bankruptcy Court's jurisdiction because it resolved a core bankruptcy proceeding, and the Bankruptcy Court did not abuse its discretion in approving the Settlement because its terms reflected the relative strength of the parties' positions. The Court will therefore affirm the Bankruptcy Court's orders.

## BACKGROUND

When James and Brenda Kay Brown married in 2008, James was an extremely wealthy man. No. 12-110, R. 1-2 at 2 ¶¶ 1, 3.[2] Thanks to a series of business investments, he had amassed a personal fortune of more than $114 million. *Id.* at 2 ¶ 3. While Brenda was by no means poor, her net worth of $236,000 paled in comparison to James's. *Id.* Like many wealthy people who marry late in life, James took steps to secure the fortune he had amassed. *Id.* at 2 ¶ 2; *see Wehrle*, R. 1 at 6 ¶ 21.

---

[2] Since this Memorandum Opinion and Order addresses appeals from two separate cases, the Court will use an abbreviated citation system to indicate citations to each docket. The appeals will be cited using case numbers. *Brown v. Brown*, No. 7:12-cv-110 (filed Oct. 1, 2012), will be cited as "No. 12-110, R. __ at __." *Brown v. Wehrle*, No. 7:12-cv-120 (filed Oct. 17, 2012), will be cited as "No. 12-120, R. __ at __." The cases in bankruptcy court will be cited using case names. The main bankruptcy case, *In re Brown*, No. 7:12-bk-70013-acs (filed Jan. 13, 2012), will be cited as "*In re Brown*, R. __ at __." The adversary proceeding, *Brown v. Wehrle*, No. 7:12-ap-7004-acs (filed Jan. 24, 2012), will be cited as "*Wehrle*, R. __ at __."

The day of their wedding, James had Brenda sign an antenuptial agreement ("Antenuptial").[3]  No. 12-110, R. 1-2 at 2 ¶¶ 2–4.  Under the Antenuptial, all the real and personal property James and Brenda owned when they were married would remain their separate property, both during and after marriage.  *Id.* at 2 ¶ 2.  Furthermore, the Antenuptial provided that Brenda would not receive anything from James's estate if they divorced.  *Id.* at 2 ¶ 7.  Similarly, James's will stipulated that Brenda would not receive anything from his estate if he died.  *Id.*  The Antenuptial was not slapped together and signed on a whim.  Both parties had to gather their financial information weeks earlier in order to define their separate assets.  *Id.* at 14–15.  And James hired separate attorneys to review the Antenuptial with both parties before the wedding.  *Id.* at 2 ¶¶ 4–5, 15–16.  Brenda's attorney, John Keith, reviewed the Antenuptial for Brenda and met with her several times to discuss it.  *Id.* at 16–17; *see also In re Brown*, R. 260-10 (detailing attorney John Keith's consultation with Brenda).  She repeatedly rebuffed the concerns he raised about the Antenuptial because she believed she could get James to change it once they were married.  No. 12-110, R. 1-2 at 17.  Later, Brenda would claim that the Antenuptial was foisted on her with no warning, little time to review its terms, and no chance to consult an attorney.  *See id.* at 15.

Ten months after the wedding, James suffered a debilitating stroke that confined him to a nursing home.  *Id.* at 3 ¶ 8, 17–18.  Several months after the stroke, Brenda had James sign documents giving her limited authority to handle his financial affairs ("Power of Attorney").  *Id.* at 3 ¶¶ 9–10, 17–18.  She then used her Power of Attorney to a number of

---

[3] Antenuptial agreements are the same as prenuptial agreements.  Individuals entering into a marriage use them to define various terms for the marriage and its dissolution.  *See generally* Developments in the Law – The Law of Marriage and Family, *Marriage As Contract and Marriage As Partnership: The Future of Antenuptial Agreement Law*, 116 Harv. L. Rev. 2075 (2003).

questionable ends, including:  naming herself the joint owner of $5 million in Certificates of Deposit ("CDs") of which James had been the sole owner; buying an $800,000 home solely in her name; buying a $64,000 Mercedes Benz solely in her name; and having a new will drafted for James that left his entire estate to Brenda or her children.  *Id.* at 3−4 ¶ 15.

But Brenda's spending spree would not last long.  Richard Wehrle, James's attorney, filed suit in state court to challenge Brenda's actions.  *Id.* at 3 ¶ 12.  The suit sought to name Wehrle as conservator of James's estate and to prevent Brenda from selling a nursing home owned by James.  *Id.*  After a hearing, the state court appointed Wehrle as James's conservator, and named James's brother, Paul, as his health care guardian.  *Id.* at 3 ¶ 13.  The order appointing Wehrle as James's conservator instructed him to "vigorously pursue the recoupment of [James's] assets."  *Id.* at 3 ¶ 14 (quoting Conservator Order).

Wehrle's pursuit was indeed vigorous.  He quickly returned the $5 million in CDs to James's sole ownership and filed three lawsuits against Brenda in state court.  *Id.* at 4−5 ¶¶ 16–17.  Wehrle also filed a divorce suit and a petition for legal separation.  *Id.* at 5 ¶¶ 17–18.

Without access to James's estate, Brenda soon filed for bankruptcy.  *Id.* at 5 ¶ 19.  Shortly thereafter, she filed an adversary proceeding that sought, among other things, declarations that:  (1) the Antenuptial was invalid and unenforceable; (2) the new will was valid and enforceable; and (3) half the value of the CDs was property of Brenda's estate ("Estate").  *Id.* at 5−6 ¶ 20.  She also filed her initial schedules and statement of financial affairs which listed among her personal property:  (1) her interests in all of James's assets and (2) all other interests she had in James's estate.  *Id.* at 6 ¶ 21 (citing *In re Brown*, R. 32 at

4

8).  She listed those same interests as her personal property in the First Amended Schedules she filed several weeks later.  *Id.* at 6 ¶ 23 (citing *In re Brown*, R. 86 at 4–5).  Then, in March of 2012, Brenda's bankruptcy proceeding was converted from a Chapter 11 to a Chapter 7 proceeding, and James Westenhoefer became the trustee for the Estate ("Trustee").  *Id.* at 1, 6 ¶¶ 24–25.

The Trustee acted quickly to take stock of the Estate.  He filed a second amended set of schedules, which still included Brenda's claims to James's assets.  *Id.* at 6 ¶ 26 (citing *In re Brown*, R. 178).   At that point, eight parties—comprised of James and his various businesses—had filed proofs of claim against the Estate totaling tens of millions of dollars. *Id.* at 6–7 ¶ 28.  The Trustee began investigating the various claims the Estate had against those creditors.  *Id.* at 7 ¶¶ 28–29.   That investigation led the Trustee to conclude that Brenda's claims were certain to fail, and he began settlement negotiations with the Estate's creditors.  *Id.* at 7 ¶ 31, 14.

The Trustee soon reached a settlement agreement with the creditors ("Settlement"), and the parties filed a joint motion to approve the Settlement in July of 2012.  *Id.* at 7 ¶ 31. The Settlement was not a one-way street, though it did reflect the relative strength of the parties' positions.  The Estate would be allowed to liquidate various assets without litigating their ownership rights.  *Id.* at 7–8.  In return, the Trustee would allow the creditors to make various claims against the Estate and disclaim any interests the Estate had in James's real estate holdings.  *Id.* at 8–9; *see also id.* at 4 ¶ 15(f) (explaining that "Brown Real Properties" refers to James's real estate holdings).  Also, the Estate would transfer various properties to the creditors—free and clear—once the Estate obtained possession of them.  *See id.* at 8–9.

Finally, the Settlement called for the parties to enter into an agreed order declaring that: (1) the Antenuptial was valid and enforceable ("Antenuptial Endorsement"); and (2) the new will Brenda had drafted was void *ab initio* and James's initial will was valid and controlling. *Id.* at 9. Brenda filed an objection to the Settlement. *See Wehrle*, R. 44.

The Bankruptcy Court then considered the motion to approve the Settlement and Brenda's objection. The court reviewed the filings and held three hearings on the issues raised in her motion. *See* No. 12-110, R. 1-2 at 2. The Bankruptcy Court ultimately approved the Settlement and its transfer of assets, except for the provisions addressing the wills. *Id.* at 20–21.[4] Two of the issues addressed in its opinion are relevant on appeal.

First, the Bankruptcy Court addressed the jurisdictional issue that Brenda had raised. *Id.* at 9. Brenda argued that Antenuptial Endorsement was outside the bounds of bankruptcy jurisdiction. *Id.* Specifically, she argued that it fell within the "domestic relations" exception, which prevents bankruptcy courts from addressing three family-law issues: divorce, alimony, and child custody. *Id.* (citing *Marshall v. Marshall*, 547 U.S. 293, 307–08 (2006)). The Bankruptcy Court, however, determined that the Antenuptial did not fall into one of the three discrete issues covered by the "domestic relations" exception because it was not a divorce decree, an award of alimony, or a determination of child custody. *Id.* at 12–13 (citing *Marshall*, 547 U.S. at 307–08 and *In re Protan*, No. 2:11-cv-0057-TEJ, 2011 WL 4597343, at *17 (S.D. W. Va. 2011)). Therefore, the court concluded that it had jurisdiction to approve the Antenuptial Endorsement. R. 1-2 at 12–13.

---

[4] The Bankruptcy Court held the issue was not ripe for determination because James was still alive and thus determining which will was valid would not affect the property of the Estate at that time. No. 12-110, R. 1-2 at 10–12 (citing, *inter alia*, *In re Ring*, 138 Fed. App'x 834 (7th Cir. 2005) and *Veith v. City of Louisville*, 355 S.W.2d 295, 297 (Ky. 1962)).

The Bankruptcy Court then considered the merits of the Settlement itself. It reviewed the testimony presented at the evidentiary hearings, including testimony from Brenda herself, and concluded that it was "unlikely that the Estate would prevail if it litigated the claims against the Conservator Parties." *Id.* at 18. The Bankruptcy Court also found that the Trustee's evaluation of the Estate's claims was "well reasoned and well supported by the overwhelming weight of the evidence." *Id.* at 14. Thus, when the Bankruptcy Court reviewed the Settlement's terms under Bankruptcy Rule 9019, it concluded that the Settlement was "fair and equitable" under the standard four-factor analysis. *Id.* at 18–20 (quotation omitted). The Bankruptcy Court therefore approved the Settlement and ordered its terms be enforced, except for those involving the wills. *Id.* at 20–21.

Brenda then filed two appeals. One challenges the Bankruptcy Court's order in the main bankruptcy case approving the Settlement. *See* 12-110, R. 1. The other challenges the order in the adversary proceeding approving the Settlement. *See* 12-120, R. 1. Since the Bankruptcy Court's orders are substantively identical, the Court consolidated them into a single appeal. No. 12-110, R. 9; No. 12-120, R. 5.

## DISCUSSION

Brenda's appeal claims to raise four issues, but her brief collapses them into two general challenges to the Bankruptcy Court's orders. *Compare* No. 12-110, R. 12 at 4 (identifying four issues for appeal), *with id.* at 10–14 (raising two general challenges to the Bankruptcy Court's orders). The Court thus addresses two questions. First, did the Bankruptcy Court have subject-matter jurisdiction under 11 U.S.C. § 541 to approve the Settlement's provisions? *See id.* at 4, 10–12. Second, did the Bankruptcy Court err in

approving the Settlement's terms given the strength of Brenda's claim in the adversary proceeding that the Antenuptial was unconscionable?  *See id.* at 4, 13–14.  The Court concludes that the Bankruptcy Court:  (1) did have subject-matter jurisdiction to approve the Settlement; and (2) did not abuse its discretion approving the Settlement's terms. Accordingly, the Court will affirm the decision of the Bankruptcy Court.

## I.      Standard of Review

The Court reviews the Bankruptcy Court's legal conclusions de novo and its factual findings for clear error.  Fed. R. Bankr. P. 8013; *Waldman v. Stone*, 698 F.3d 910, 922 (6th Cir. 2012).

## II.     The Bankruptcy Court's Subject-Matter Jurisdiction Over the Settlement

Brenda raises a different jurisdictional argument than the one she made to the Bankruptcy Court.  Instead of asserting the domestic relations exception, she argues that the Bankruptcy Court did not have subject-matter jurisdiction over the Settlement because the Antenuptial Endorsement compromised her state-court claims against James.[5]  According to her, the Bankruptcy Court could not do that because those claims were not property of the Estate.  But her argument ignores two facts:  (1) she brought a declaratory action to invalidate the Antenuptial, and (2) her claims against James's property had vested by the time she filed for bankruptcy.  The Bankruptcy Court therefore had jurisdiction to approve the Antenuptial Endorsement.

---

[5] Brenda cites the Supreme Court's decision in *Stern v. Marshall* at length.  *See* No. 12-110, R. 12 at 11 (quoting *Stern*, 131 S.Ct. 2594, 2618 (2011)).  The portion that she quotes deals with the judicial power under Article III, not subject-matter jurisdiction under the bankruptcy statute.  Though Brenda does not appear to be claiming that the Bankruptcy Court intruded on Article III, the Court notes that, for the reasons provided later, the Bankruptcy Court's approval of the Settlement was a core bankruptcy proceeding.  And there is no constitutional problem with bankruptcy courts entering final judgment in core proceedings.  *Waldman v. Stone*, 698 F.3d 910, 916–17 (6th Cir. 2012).

**A.      The Bankruptcy Court Had Jurisdiction Over All the Property of the Estate, Including Causes of Action Brenda Held When She Filed**

When Brenda filed her Chapter 11 petition, she created an "estate" whose "property" included all of her "legal or equitable interests" in properties.   11 U.S.C. § 541(a)(1); *Honigman v. Comerica Bank* (*In re Van Dresser Corp.*), 128 F.3d 945, 947 (6th Cir. 1997). Section 541(a) defines the Estate's property broadly in order to bring "anything of value" that the debtor has into the proceedings.   *Lyon v. Eiseman* (*In re Forbes*), 372 B.R. 321, 330 (B.A.P. 6th Cir. 2007) (quotation omitted).   That way, all the Estate's assets are on the table and the Bankruptcy Court can efficiently administer the estate.   *Cf. Matter of Xonics, Inc.*, 813 F.2d 127, 131 (7th Cir. 1987) ("The bankruptcy jurisdiction is designed to provide a single forum for dealing with all claims to the bankrupt's assets."); *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995) ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate . . . ." (quotation omitted)).   Of course, § 541(a)'s definition of "property" does not itself create interests in property.   *See Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984).   Instead, the Court looks to state law to determine if the debtor has a legal or equitable interest in the property.   *See, e.g.*, *In re Buttermilk Towne Ctr., LLC*, 442 B.R. 558, 562–64 (B.A.P. 6th Cir. 2010) (applying state law).

As the text of the statute makes clear, the Estate's property includes more than just the money in Brenda's bank account and the cars parked in her garage.   *See In re Forbes*, 372 B.R. at 331 (explaining that § 541(a) recognizes "a variety of tangible or intangible property as well as future, non-possessory, or contingent interests and causes of action" (citations omitted)).   The Estate's "legal or equitable interests" included any causes of action that

9

Brenda had against other parties when she filed for bankruptcy.  *See, e.g.*, *In re Van Dresser Corp.*, 128 F.3d at 947 ("[I]t is well established that the 'interests of the debtor in property include causes of action." (quotations omitted)); *see also Bracewell v. Kelley* (*In re Bracewell*), 454 F.3d 1234, 1242 (11th Cir. 2006) ("[I]f [the debtor's claim] arises on or before the commencement of the bankruptcy case, it is part of the bankruptcy estate."); *Bauer v. Commerce Union Bank*, 859 F.2d 438, 440–41 (6th Cir. 1988).  Like other issues that arise when defining the debtor's legal or equitable interest in property, the Court looks to state law to determine whether the cause of action had vested by the time the debtor filed for bankruptcy.  *See In Re Bracewell*, 454, F.3d at 1242.  If the cause of action has vested, then it is part of the estate.

### B.    Brenda's Declaratory Action to Invalidate the Antenuptial and the Settlement Resolving it Were "Core Proceedings"

Brenda's declaratory judgment action to invalidate the Antenuptial was a core proceeding under 11 U.S.C. § 157(b)(2).  Actions that concern the administration of the estate's property—including those that define whether an interest is part of the estate's property—are "core proceedings" under § 157(b)(2).  *See The Cain Partnership, Ltd. v. Pioneer Inv. Servs. Co.* (*In re Pioneer Inv. Servs. Co.*), 946 F.2d 445, 448 (6th Cir. 1991); *see also St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("[P]roceedings having the effect of bringing property into the estate of the debtor are core proceedings as defined by section 157(b)." (citation omitted)); *Point Blank Solutions, Inc. v. Robbins Geller Rudman & Dowd LLP* (*In re Point Blank Solutions, Inc.*), 449 B.R. 446, 449 (Bankr. D. Del. 2011) ("It is well established that proceedings to determine what constitutes property of the bankruptcy estate under section 541(a) of the Bankruptcy Code are core

proceedings." (citation omitted)).  Brenda's action to declare the Antenuptial invalid and unenforceable certainly qualifies.  Her declaratory action would have established—according to Brenda's own complaint—that she was "entitled to an equitable division of property owned by Mr. Brown and by Mr. Brown and [Brenda], jointly."  *Wehrle*, R. 1 at 30 ¶ 153; *see also* Ky. Rev. Stat. § 403.190(1) (providing for the division of marital property based on four equitable factors).  By arguing that she deserved an equitable stake in the Browns' marital property, Brenda's declaratory action was arguing that a portion of the marital property was part of the Estate's property.  *See* 11 U.S.C. § 541(a)(1); *St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 701.  So the declaratory action was a "core proceeding" that was well within the Bankruptcy Court's jurisdiction.

Since the declaratory action was a core proceeding, and the Antenuptial Endorsement resolved that core proceeding, the Bankruptcy Court had subject-matter jurisdiction over the Antenuptial Endorsement.  Bankruptcy Courts have the power to approve settlements under Bankruptcy Rule 9019(a) and have subject-matter jurisdiction wherever there is a "nexus" between the settlement and their jurisdiction.  *Munford v. Munford, Inc.* (*In re Munford, Inc.*), 97 F.3d 449, 453−54 (11th Cir. 1996); *see also Cent. Vermont Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 191−92 (2d Cir. 2003) (explaining that the bankruptcy court will have jurisdiction to order an injunction where it resolves a "core proceeding").  Here, the "nexus" could not have been more direct.  The Antenuptial Endorsement went no further than was necessary to resolve the one and only question raised by the declaratory action: Was the Antenuptial valid and enforceable?  The fact that the Antenuptial Endorsement answered that question in the affirmative, and thereby declared that the Estate had no interest

in James's property, does not negate the Bankruptcy Court's jurisdiction. *See In re Southland + Keystone*, 132 B.R. 632, 638 (B.A.P. 9th Cir. 1991) (rejecting an argument similar to Brenda's because it would mean "any bankruptcy court order determining that assets are not property of a bankruptcy estate would be of no effect because the court would not have had jurisdiction to enter the order"). Furthermore, the Bankruptcy Court's approval of the Antenuptial Endorsement was itself a core proceeding, because it approved an agreement compromising[6] the Estate's claims. *See Wehrle*, R. 54 at 2; *see also W.J. Servs., Inc. v. Commercial State Bank of El Campo*, 990 F.2d 233, 234 (5th Cir. 1993) ("A proceeding to determine the acceptability of agreements compromising claims of the bankruptcy estate is a core proceeding which can be finally heard and determined by the bankruptcy court . . . ." (citing 28 U.S.C. § 157(b)(2) and *In re Case*, 937 F.2d 1014 (5th Cir. 1991))). Thus, the Bankruptcy Court had jurisdiction to enter final judgment on Brenda's declaratory action by approving the Antenuptial Endorsement.

### C.   11 U.S.C. § 541(a)(5) Does Not Affect the Bankruptcy Court's Jurisdiction Over the Settlement

Section 541(a)(5) specifies that an estate's property includes any interest in property "that the debtor acquires or becomes entitled to acquire within 180 days." 11 U.S.C. § 541(a)(5). Brenda uses this provision to argue that the Bankruptcy Court did not have jurisdiction over the Antenuptial Endorsement because the Antenuptial Endorsement affects property that she would acquire outside of § 541(a)(5)'s 180-day window. Specifically, she asserts that because the state-court claims she has against James will be resolved after the

---

[6] "Compromise" is another term for settlement, meaning "an agreement for the settlement of a real or supposed claim in which each party surrenders something in concession to the other." Black's Law Dictionary (9th ed. 2009) (Westlaw). The term is frequently used in discussing settlements of a bankruptcy estate's claims. *See, e.g., In re Ring*, 138 F. App'x 834, 836 (7th Cir. 2005) ("Bankruptcy courts may approve a trustee's proposal to compromise claims of the estate, including legal claims . . . .").

180-day window closes, those claims are not property of the Estate.  No. 12-110, R. 12 at 12.

And if those claims are not property of the Estate, the Bankruptcy Court had no jurisdiction

to resolve them through the Antenuptial Endorsement.  *Id.*  Her argument does not persuade

for three reasons.

      ***Brenda's Declaratory Action was Sufficient to Create Jurisdiction:***  As an initial

matter, whether Brenda's state-court claims fall outside § 541(a)(5)'s 180-day window is

irrelevant.  The Bankruptcy Court clearly had jurisdiction over her declaratory action, which

authorized the Bankruptcy Court to approve, and enter final judgment on, the Antenuptial

Endorsement.

      Brenda brought her declaratory action to invalidate the Antenuptial just eleven days

after she filed for bankruptcy—well within the 180-day window.  *See* No. 12-110, R. 1-2 at 5

¶¶ 19–20.  That cause of action was itself property of the Estate.  *See Bauer*, 859 F.2d at

440–41; *see also In re Forbes*, 372 B.R. at 330 (stressing that "property" should include

"anything of value that the debtors have" (quotation omitted)).  And the Bankruptcy Court

had jurisdiction to approve the Antenuptial Endorsement because it compromised the

Estate's cause of action.  *See Morley v. Ontos, Inc.* (*In re Ontos, Inc.*), 478 F.3d 427, 433 (1st

Cir. 2007) (holding that settlements resolving the estate's claims may be core proceedings

under 28 U.S.C. § 157(b)(2)(A), (H), (O)); *In re Ring*, 138 F. App'x 834, 836 (7th Cir. 2005)

("Bankruptcy courts may approve a trustee's proposal to compromise claims of the estate,

including legal claims . . . ." (citing 28 U.S.C. § 157(b)(2) and collecting cases)).

      The fact that the Bankruptcy Court's resolution of Brenda's declaratory action might

affect her state-court claims is irrelevant.  Once Brenda brought her claim in the adversary

13

proceeding, the Bankruptcy Court acquired exclusive jurisdiction over it.  *See* 28 U.S.C § 1334(e)(1) (granting exclusive jurisdiction over the debtor's property at the commencement of bankruptcy proceedings); *see also In re VistaCare Grp., LLC*, 678 F.3d 218, 228 (3d Cir. 2012) (explaining that exclusive jurisdiction is necessary for uniform and efficient application of bankruptcy law to an estate).  Thus, § 541(a)(5) did not divest the Bankruptcy Court of jurisdiction.  Quite the opposite.  It gave the Bankruptcy Court jurisdiction over Brenda's declaratory action and the Antenuptial Endorsement resolving it.

   ***Claims Become Property When the Cause of Action Vests:***  Brenda is simply wrong in asserting that her state-court claims fall outside the 180-day window set by § 541(a)(5). She argues that her state-court claims are not the Estate's property because any money judgment she would receive from those claims would come more than 180 days after she filed her bankruptcy petition.  This argument misunderstands the definition of "property" under § 541(a) by confusing payment on a cause of action with an interest in a cause of action.

   Brenda's state-court claims are property of the Estate because those causes of action vested when James commenced proceedings in state court.  When James filed his suits against Brenda—well before she filed for bankruptcy—she could have brought whatever claims she had to James's property, either as counterclaims to his suit or by filing her own suit.  *See* No. 12-110, R. 1-2 at 4–5 ¶¶ 16−18.  In fact, Brenda admits that she has *already* asserted claims in state court against James's property.  *See* No. 12-110, R. 12 at 12 ("Mrs. Brown *has asserted* legal rights in state court . . . ." (emphasis added)).  The only reason Brenda has not been able to move forward on those vested claims is because her own

14

bankruptcy petition stayed the state-court proceedings involving the Estate.[7]  *See* 11 U.S.C. § 362(a).  But her claims have vested.  And as explained above, the ability to bring a cause of action is itself property of the estate.  The money from that claim does not have to be in the debtor's hand when he or she files for divorce.  *See In re Forbes*, 372 B.R. at 331 (explaining that § 541(a) recognizes "a variety of tangible or intangible property as well as future, non-possessory, or contingent interests and causes of action" (citations omitted)).

It does not matter that the success of Brenda's claims against James's property might depend on her invalidating the Antenuptial.  Contingent interests are part of the Estate's property.  *See id.*; *Segal v. Rochelle*, 382 U.S. 375, 379 (1966) ("[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed.").  If Brenda's argument were true, a debtor's claim would be excluded from the estate every time the cause of action was subject to a contractual defense.  That would undermine the expansive definition of "property" adopted in § 541(a)(1).  *See In re Forbes*, 372 B.R. at 330 (explaining that "property" should include "anything of value that the debtors have" (quotation omitted)).  Thus, Brenda's argument fails.

*Brenda's Marital Property Claims are Property of the Estate:*  Brenda's argument also fails to appreciate the nature of her marital interests.  The Antenuptial governed Brenda's ability to claim a portion of James's property as part of their marital estate.  *See* No. 12-110, R. 1-2 at 2 ¶ 7.  And since whatever claims she had to the marital estate had vested

---

[7] Ironically, Brenda could have asked the Bankruptcy Court to lift the stay on the state-court divorce proceedings so that she could pursue her claims to James's property there.  *See White v. White* (*In re White*), 851 F.2d 170, 174 (6th Cir. 1988) (affirming bankruptcy court's decision to lift automatic stay to allow state-court divorce action to proceed).

by the time she filed for bankruptcy, those claims were property of the Estate and the Bankruptcy Court had jurisdiction over them.

Where state law provides that a spouse's "right to seek equitable distribution" vests at the beginning of the divorce proceeding, the debtor's marital property claims are property of the estate. *Polliard v. Polliard (In re Polliard)*, 152 B.R. 51, 53 (Bankr. W.D. Pa. 1993). Since James filed for divorce before Brenda petitioned for bankruptcy, *see Wehrle*, R. 54 at 5 ¶¶ 17–19, the question becomes whether their marital property interests vested when the divorce action was filed. *See In re Radinick*, 419 B.R. 291, 295 (Bankr. W.D. Pa. 2009) (analyzing whether a debtor's marital rights were property of her estate by asking whether her "marital interest in property (i.e., a right to equitable distribution) vests immediately upon the initiation of a divorce action coupled with the request for equitable distribution of marital assets"); *see also Fritch v. Fritch* (*In re Fritch*), No. 09-ap-57022-BHL-7, 2011 WL 2181661, at *2 (Bankr. S.D. Ind. 2011) (analyzing a similar question by asking "when did the Debtor's interest in marital property, as defined by the Prenuptial Agreement, arise?"). If Brenda's rights to marital property vested at the time James filed for divorce, then those claims are property of the Estate and the Bankruptcy Court had jurisdiction over them.

Answering that question requires examining Kentucky Revised Statute § 403.190, which deals with the disposition of property in a divorce. A careful reading of the statute, and decisions construing similar statutes in other states, reveals that Brenda's right to equitable distribution vested when James filed for divorce. The relevant provision of § 403.190 reads:

> In a proceeding for dissolution of the marriage or for legal separation, or in a
> proceeding for disposition of property following dissolution of the marriage by

> a court which lacked personal jurisdiction over the absent spouse or lacked jurisdiction to dispose of the property, the court shall assign each spouse's property to him.

Ky. Rev. Stat. § 403.190(1).  The key phrase is "in a proceeding."  Unlike some states, such as New Jersey, Kentucky's statute does not require a divorce decree to issue before the property is divided.  *Compare* N.J.S.A. § 2A:34-23 (specifying that the court may equitably distribute property only after "a judgment of divorce . . . is entered"), *with* Ky. Rev. Stat. § 403.190 (providing that the division of marital property shall occur "[i]n a proceeding for dissolution of the marriage or for legal separation").  Thus, under the plain meaning of the statute, Brenda had a right to seek equitable distribution of the marital property as soon as the divorce was filed.  So her rights vested as soon as James filed for divorce, and thus the claims she would have to James's property in the divorce proceedings are property of the Estate.  *Johnson v. Fisher* (*In re Fisher*), 67 B.R. 666, 668 (Bankr. D. Colo. 1986) (finding that a debtor's claims to marital property were the "property" of her estate because, in Colorado, "once a dissolution proceeding is filed, a wife may be entitled to a division of the husband's property").

While Kentucky courts have not spoken directly on the issue, courts construing similar statutes have found that a spouse's interest in marital property vests when divorce proceedings commence.  *See, e.g.*, *In re Wilson*, 85 B.R. 722, 725–26 (Bankr. E.D. Pa. 1988) (holding that, under Pennsylvania's divorce law a spouse's interest in marital property vests at the time the divorce action is filed); *In re Questions Submitted by United States District Court in Imel v. United States*, 517 P.2d 1331, 1332 (Colo. 1974) (holding same under Colorado law); *see also* Comment, *The Maine Marital Property Act: The Duties of Divorce Courts and the Right to an Equitable Share of Marital Assets*, 31 <u>Me. L. Rev.</u> 333, 336 &

n.14, 354−54 (1980) (listing Kentucky as one of the states to model their statute after Unif. Marriage & Divorce Act § 307 (1973) and explaining that states with statutes modeled after the Act or similar to it have found that spouses' marital interests vest at the time divorce proceedings begin).   These courts' conclusions buttress the plain meaning of Kentucky's divorce statute.

Since Brenda's claim to equitable distribution vested at the time James filed for divorce, her marital property claims against James are, for purposes of bankruptcy jurisdiction, the Estate's property.   Thus, the Bankruptcy Court had jurisdiction to resolve them.[8]

## III.     The Bankruptcy Court's Approval of the Settlement

The Bankruptcy Court approved the Settlement pursuant to Bankruptcy Rule 9019(a). *Wehrle*, R. 54 at 18−20.   Under that rule, courts may approve settlements if they find that the

---

[8] Brenda waits until her reply brief to claim that the Bankruptcy Court exceeded its jurisdiction because the Antenuptial Endorsement covered maintenance payments.   *See* No. 12-110, R. 15 at 6−7.   Normally, such blatant sandbagging is grounds for deeming the argument waived.   *See, e.g.*, *Bowling v. Haeberlin*, No. 03-cv-28-ART, 2012 WL 4498647, at *10 n.2 (E.D. Ky. Sept. 28, 2012); *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 354 (6th Cir. 2009).   But subject-matter jurisdiction cannot be waived.   *See Miller v. Norfolk & W. Ry. Co.*, 834 F.2d 556, 560 (6th Cir. 1987) (citing *Mansfield, Coldwater and Lake Michigan Ry. v. Swan*, 111 U.S. 379, 382 (1884)).

Still, this argument is not worth resolving.   Appellants must support their factual claims with citations to the record.   *See* Fed. R. Bankr. P. 8010(a)(1)(E) (requiring appellate arguments to make specific citations to the record).   Yet Brenda does not cite to the section of the Antenuptial she claims governs maintenance payments.   *See* No. 12-110, R. 15 at 6−7.   What's more, she did not introduce a copy of the Antenuptial into the record in the adversary proceeding or in this appeal.   The Court has had to rely on the description of the Antenuptial's terms in the Bankruptcy Court's opinion.   And there is no evidence to support Brenda's claim about a supposed maintenance provision.   The Bankruptcy Court's opinion makes no mention of a provision in the Antenuptial governing maintenance payments.   *See* No. 12-110, R. 1-2 at 12 ("The Trustee's agreement to enter into a stipulation as to the validity of the Antenuptial Agreement is not a divorce decree, an award of maintenance, or a child custody determination, and therefore, is not subject to the domestic relations exception." (citation omitted)).   Furthermore, the creditors' proposed findings of fact and conclusions of law in the adversary proceeding professed that the Settlement "has no impact on a state court's ability to issue divorce maintenance, alimony or child custody decrees."   *Wehrle*, R. 52 at 9 ¶ 18.   Since Brenda does not provide any evidence that a maintenance provision exists in the Antenuptial, the Court will not address the argument.   *See Tevis v. Wilke, Fleury, Hoffelt, Gould & Birney, LLP* (*In re Tevis*), 347 B.R. 679, 686 (B.A.P. 9th Cir. 2006) (explaining that courts are not obligated to search for evidence when a party has not complied with Rule 8010(a)(1)(E)).

compromise is "fair and equitable." *Lyndon Prop. Ins. Co. v. Katz*, 196 F. App'x 383, 387 (6th Cir. 2006) (quotation omitted); *see also La Salle Nat'l Bank v. Holland* (*In re Am. Reserve Corp.*), 841 F.2d 159, 162 (7th Cir. 1987) (explaining that the "fair and equitable" standard applies under Bankruptcy Rule 9019(a)). To determine whether a settlement is fair and equitable, courts consider four general factors: (1) the litigation's likelihood of success; (2) the difficulty in collecting on the claims; (3) the litigation's complexity and the expense, inconvenience, and delay it creates; and (4) the creditors' assessment of the settlement. *Bauer*, 859 F.2d at 441; *see also In re MQVP, Inc.*, 477 F. App'x 310, 313 (6th Cir. 2012) (noting that the Sixth Circuit and other courts of appeal apply the four factors listed above). This Court may reverse the Bankruptcy Court's decision to approve the Settlement only if it abused its discretion. *Lyndon Prop. Ins. Co. v. Katz*, 196 F. App'x 383, 386 (6th Cir. 2006). It did not.

Brenda's only challenge to the Bankruptcy Court's approval of the Settlement is her claim that the Antenuptial was unconscionable under Kentucky law. No. 12-110, R. 12 at 13–14. While she does not clearly explain why this is grounds for overturning the Settlement, she appears to be arguing that the Bankruptcy Court abused its discretion because the Settlement abandoned a meritorious challenge to the Antenuptial. There are three general grounds for declaring an antenuptial agreement unconscionable in Kentucky: (1) the antenuptial was obtained through fraud, duress, or mistake, or by misrepresenting or not disclosing material facts; (2) the antenuptial's terms are unconscionable; or (3) the facts and circumstances have changed since the antenuptial was formed so that enforcing it now would

be unfair and unreasonable.  *See Gentry v. Gentry*, 798 S.W.2d 928, 936 (Ky. 1990).  None of those grounds apply here.

First, the Antenuptial was properly formed.  Brenda characterizes the Antenuptial as a surprise foisted on her moments before she walked down the aisle.  *See* R. 12 at 14.  But her characterization is not evidence.  *See Duha v. Agrium, Inc.*, 448 F.3d 867, 879 (6th Cir. 2006) ("Arguments in parties' briefs are not evidence.").   Furthermore, Brenda's characterization cannot overcome the substantial evidence in the record that James took elaborate steps over the course of several days to ensure that Brenda was fully informed when she signed the Antenuptial.  *See Wehrle*, R. 54 at 15–17 (summarizing the evidence). The Bankruptcy Court thus rightly concluded that there were no procedural improprieties in forming the Antenuptial.

Next, the Antenuptial was not substantively unconscionable.  Brenda's argument, in a nutshell, is this:  The Antenuptial's terms are unfair because they allow James to keep all of his millions,[9] and leave her with just the commercial property she owned when she married him.  *See* No. 12-110, R. 12 at 14.  That fact does not make the Antenuptial unconscionable. To be unconscionable, an antenuptial's terms must be "manifestly unfair."  *Gentry*, 798 S.W.2d at 936.  These terms were not.  Under the Antenuptial, the couple would keep their property separate and, in the event of a divorce, walk away with their respective property. *See Wehrle*, R. 54 at 16.  For Brenda, that would mean she would keep the commercial building she owned, along with the income she earned from renting it.  *See* No. 12-110, R. 1-2 at 7 (explaining that the "IGA Property" was Brenda's); *Wehrle*, R. 32 at 4 ¶ 10 (relaying

---

[9] The Bankruptcy Court's opinion reported that James's net worth was approximately $114 million, while Brenda claims it was $116 million.  *Compare* No. 12-110, R. 1-2 at 2 ¶ 3, *with id.*, R. 12 at 14.  As the Kentucky precedent cited here makes clear, this discrepancy is irrelevant to the outcome.

20

that Brenda reported a $2,500-per-month income from renting the property).   Kentucky courts have routinely upheld such agreements, even where there were significant disparities in the spouses' wealth.   *See, e.g.*, *Barnett v. Lovely*, No. 2009-CA-000359-MR, 2010 WL 1133249, at *1–2 (Ky. Ct. App. Mar. 26, 2010) (upholding an antenuptial agreement where the husband's assets exceed $4 million, the wife's were approximately $110,000, and the terms waived the parties' right to maintenance or spousal support and kept separate each spouse's personal holdings and incomes); *Blue v. Blue*, 60 S.W.3d 585, 586–87, 590–91 (Ky. Ct. App. 2001) (upholding a prenuptial agreement where the husband was a multimillionaire, the wife had approximately $190,000, and the terms kept separate the property each spouse owned before the marriage).   Thus, the Antenuptial's terms were not substantively unconscionable.

Finally, enforcing the Antenuptial's terms now would not be unfair or unreasonable. The touchstone of this inquiry is "the reasonable expectations of the parties as contemplated by the agreement." *Blue*, 60 S.W.3d at 590.   If enforcing the Antenuptial would produce results in line with those expectations, then the Antenuptial is not unconscionable.   *Id.* at 590–91.   That is the case here.   Enforcing the Antenuptial now would mean that James and Brenda would each leave the marriage in the same economic position as when they entered it—which is precisely the result Brenda agreed to.   *See Wehrle*, R. 54 at 16.   There is nothing unfair or unreasonable about that.

Since Brenda's only objection to the Settlement's terms is meritless, the Court cannot say that the Bankruptcy Court abused its discretion in approving the Settlement and must affirm the Bankruptcy Court's order.

## CONCLUSION

Accordingly, it is **ORDERED** that:

(1)     The Bankruptcy Court's Order Granting in Part Motion to Approve Settlement Agreement under Rule 9019 and Authorizing Transfer of Assets Under 11 U.S.C. 363, *In re Brown*, No. 7:12-bk-70013-acs, (Bankr. E.D. Ky. Aug. 24, 2012), R. 281, is **AFFIRMED**.

(2)     The Bankruptcy Court's Order Granting in Part Motion to Approve Settlement Agreement under Rule 9019 and Authorizing Transfer of Assets Under 11 U.S.C. 363, *Brown v. Wehrle* (*In re Brown*), No. 7:12-ap-7004-acs, (Bankr. E.D. Ky. Aug. 24, 2012), R. 54, is **AFFIRMED**.

(3)     Separate Judgments will be entered in each case contemporaneously with this Memorandum Opinion and Order.

This this 28th day of May, 2013.



**Signed By:**

**_Amul R. Thapar_**

**United States District Judge**